UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 3:14-CR-55 JD |
| | ) | |
| | ) | |
| JAMES P. LeDONNE | ) | |

**GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS**

The United States of America, by Clifford D. Johnson, Acting United States Attorney for the Northern District of Indiana, respectfully submits this written proffer, and moves this Court to admit certain statements against the defendant pursuant to Federal Rule of Evidence 104(a), 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

1. **GOVERNING LAW**

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy or a joint venture[1] existed; (2) the defendant and the declarant

---

[1] See *Advisory Committee Note to FRE 801 1974 Enactment* ("While the rule refers to

1

were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[2]

Under *Santiago*, the trial judge must preliminarily determine whether statements by a coconspirator of the defendant will be admissible at trial under Rule 801(d)(2)(E). In making this determination the judge must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Santiago*, 582 at 1134 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)). If the court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

---

a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged.") (citations omitted).

[2]  No Sixth Amendment confrontation issues are posed by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant. Such statements are not testimonial, and therefore are not subject to the Confrontation Clause. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)).

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule, may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *See United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of coconspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While the Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).

There is no requirement, for admissibility under Rule 801(d)(2)(E), that

the government establish all elements of "conspiracy" such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-50.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *See United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another

4

person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator or schemer. *See Longstreet*, 567 F.3d at 919; *Jones*, 275 F.3d at 652. A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *See United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy, so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *See United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A conspirator who has become inactive or less active in the conspiracy nevertheless is liable for his conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008); *see also United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010); *United States v. Maldonado-Rivera*, 922 F.2d 934 (2nd Cir. 1990). Rather, the government

5

need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *See Bolivar*, 532 F.3d at 604-05. The government need not show that the person to whom the statement is made was a member of the conspiracy. *See United States v. Gupta*, 747 F.3d 111, 124-26 (2d Cir. 2014); *United States v. Lloyd*, 807 F.3d 1128, 1160-61 (9th Cir. 2015).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 at *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted); *see also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

– to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);

– to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

– to identify other members of the conspiracy and their roles, *Alviar,*

573 F.3d at 545;

– to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

– as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

– to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 604-05 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

– to control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; *United States v. Molinaro,* 877 F.2d 1341*,* 1343-45 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

– to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

– to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

– to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513, 524 (7th

7

Cir. 2008);

– "describing the purpose, method, or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

– to reveal the nature and objective of the conspiracy, *United States v. Tuchow*, 768 F.2d 855, 869 (7th Cir. 1985).

2. **THE EVIDENCE REGARDING THE CONSPIRACY AND SCHEME**

The defendant operated and controlled companies that sold trailers, vehicles, and equipment used to repair fiber optic cable. From 2009 through 2013, the defendant defrauded more than 60 customers by convincing each to place orders and provide down payment money. To lure customers into sales, the defendant and his employees made false statements about the products and delivery dates. When customers complained about lack of delivery, the defendant and his employees continued to pass along false information about delivery dates. For some customers, the defendant promised refunds, which he never made. As part of the scheme, the defendant used the bankruptcy system to fend off his customers and other creditors who had obtained judgments against him or were owed money by defendant. In the end, the victims lost more than 1.5 million dollars.

This proffer does not identify all of the fraudulent acts committed by the defendant and his employees. Rather, as set forth below, the proffer

establishes by a preponderance of the evidence the existence of the scheme (or joint venture) and the roles of some of the conspirators[3] who participated in it. The evidence includes expected testimony from employees who were involved in the scheme, records from companies controlled by the defendant, testimony from customers, and communications (email and verbal) from the defendant and his employees.

EN[4] worked for the defendant in 2011 and 2012. He also loaned money to the defendant to keep the businesses operating. EN heard the defendant constantly lie to customers before and after orders were placed. At the defendant's direction, EN misled customers in various ways. He falsely told some customers that trailers and vehicles were in production when nothing was occurring. He claimed trucks were out for repairs when that was not true. EN also created photos to give the impression that trailers were on the assembly line. Using Photoshop, he created fake ads for vehicles giving the impression that one of the defendant's companies owned the vehicle depicted in the ad. These flyers were then sent by email to potential customers. In fact, the defendant accepted money from customers who wanted to purchase the vehicles depicted in the fake ads knowing he did not own the vehicles.

---

[3] On December 1, 2016, the government provided a list of unindicted coconspirators to the defendant. Each individual had worked for the defendant at various times.

[4] The defendant is aware of the names of the persons referred to by initials in this document. The government has provided most of the *Jencks* Act materials.

Of course, the defendant never provided those vehicles to the customers. He never refunded any money either.

AK worked for the defendant on two occasions. Near the end of her first engagement, she loaned the defendant $30,000 to keep the company running. AK knew the defendant continued to accept money from customers while knowing he had no parts to build trailers. When customers or potential investors visited the business, the defendant told workers to look busy and "make sparks". AK returned to work a second time hoping the defendant would return her loan money. During her second stint, she never saw any trailers produced. AK helped the defendant sell a truck to a customer in which he could not produce the title. She heard the defendant lie to customers about delivery dates and the status of trailer production. At the direction of the defendant, she lied to customers.

TK worked for the defendant at various times. Her last period began in mid-2013. She had also loaned money to the defendant. During this time, TK took in at least eight trailer orders and down payment money. She heard the defendant tell customers he had items in stock when that was not true. She only saw one partially completed trailer leave the facility. The defendant told her to lie to customers when they called. She did so.

DC worked for the defendant in 2012 as a salesman. He helped sell at least 20 trailers and vehicles. He never saw one trailer completed. After

orders were obtained, the defendant told DC to provide excuses to pass onto customers. The defendant also found trucks for sale on the internet and instructed DC to create fake ads giving the impression the defendant owned the trucks. DC made about ten fake ads which allowed the defendant to sell trucks that he did not own.

     PD worked for the defendant on two different occasions. The defendant lied to customers in front of PD.

     In October 2009, the defendant sold a 2008 Ford F550 truck to El Oso, a business located in Hammond. El Oso financed the transaction and paid $64,500 to L6 Systems, a business controlled by the defendant. At the time of the sale, the defendant knew the truck belonged to the bankruptcy estate of Techline, another business controlled by the defendant. In January 2010, an employee of the defendant contacted El Oso and requested the vehicle be returned because they had shipped it in "error". No mention was made about the truck belonging to the Techline bankruptcy estate. El Oso returned the truck believing another would be provided soon. In February, the defendant promised to remedy the situation in one week. He later promised to pay El Oso for the loss of use of the truck. In July, the defendant issued a check to El Oso but stopped payment before El Oso could deposit the funds. The defendant never refunded El Oso's money. At a L6 Systems bankruptcy hearing in January 2011, the defendant lied to the Trustee when he claimed

11

a rogue employee sold the truck without his knowledge. In fact, the defendant directed his employees to the sell the truck. L6 Systems records show the defendant was involved in the sale.

In July 2011, the defendant convinced the owner of Spectrum Advantage to buy a truck insert that would be used for fiber optic cable repair services. The defendant promised to deliver the insert within four weeks. Spectrum Advantage wired $11,697 to a bank account controlled by the defendant. In late August, EN told Spectrum the insert would be available on September 9th knowing it could not be delivered. In late October, after receiving complaints from Spectrum, the defendant promised a refund. A few weeks later, emails from AK falsely claimed the refund check had been issued. After the AK email, the defendant told the customer that his "corporate" office had not mailed the check. Another email, this time from the defendant's financial partner, claimed the refund would be sent in 5 to 10 days.[5] In fact, Spectrum never received a refund or the insert.

In July 2012, OPTX, a business in Tennessee, received a fake ad prepared by EN giving the impression that the defendant's business owned an aerial boom truck. EN sent the flyer (shown below) knowing the defendant

---

[5] There is strong evidence that the emails from AK and the financial partner were authored by the defendant. As explained above, it is not necessary to identify the declarant as long as the statement furthered the conspiracy.

was trying to sell a vehicle he did not own. OPTX agreed to buy the truck for $30,000 and wired $15,000 to a bank account controlled by the defendant, who told OPTX the truck would be delivered by Labor Day. Before OPTX realized it was never getting its truck, EN, at the direction of defendant, tried to placate OPTX by reducing the contract price by $5,000. A day later, EN, who felt guilty, admitted to OPTX that the truck would not be sent because the defendant never owned it. Additional communications were sent from EN's email account claiming the truck would be sent or a refund would be provided. In fact, the defendant never produced the truck because it was owned



and possessed by a man in Georgia. The photos depicted in the ad were taken

in Georgia. The defendant never provided a refund to OPTX either.

In early August 2013, Spliceworks contacted LG Engineering and spoke with TK about buying a trailer. During negotiations, TK reduced the sale price and claimed the delivery could be made in two weeks. To lure Spliceworks into the sale, the defendant offered another price reduction and free shipping. On August 20th, Spliceworks agreed to pay $19,500 and wired $9,750 to a bank account controlled by the defendant. The defendant's business records confirm the trailer was to be delivered by September 10th. After the wire transfer, TK sent emails reassuring everything was fine. On September 23rd, the defendant returned an email falsely claiming a critical employee had cut his hand and the assembly was "off track." TK then sent a series of emails with false information. After a request from Spliceworks, she sent photos of a trailer giving the impression it was completed. The photos were fake. In late October, TK claimed the trailer would be sent next week. In early November, TK called Spliceworks and claimed the trailer would be shipped on Thursday. In fact, Spliceworks never received the trailer or a refund.

In August 2013, CR Action ordered a trailer and wired $6,250 to a bank account controlled by the defendant. To induce CR Action into the sale, TK claimed it was her first sale and would be delivered if the money was wired by 5:00 pm. She also told CR Action she would switch tags on the assembly

line to make sure CR Action's trailer was one of the first out the door. After the order, TK and the defendant provided different excuses why the trailer was not delivered. No trailer was ever produced. TK also provided at least four others customers with shipping dates knowing that nothing had been produced.[6]

3. **COCONSPIRATOR STATEMENTS**

The government seeks to introduce the following types of statements from the defendant's employees:

a. Verbal and written communications from the employees promising the delivery of trailers, trucks, and equipment.

b. Verbal and written excuses from the employees explaining why the items could not be produced or delivered.

c. Verbal and written promises made by the employees telling customers that refunds would be provided.

d. Verbal and written communications from the employees regarding the sale of vehicles not owned by the defendant.

e. Business records from the defendant's companies regarding the sale of trailers, vehicles, and items never produced. "Records that can be shown by a preponderance of the evidence to have been made by a

---

[6] The government is not detailing each and every proposed coconspirator statement of each witness or document but rather is giving a representative sample of the statements from each witness and/or document

member of a conspiracy may be admitted under Rule 801(d)(2)(E) even if their precise author cannot be identified." *United States v. Lyons*, 740 F.3d 702, 719 (1st Cir. 2014).

The statements made by the defendant's employees were made in furtherance of the scheme. They were integral to the conspiracy and its success.[7]

### 4.   ALTERNATIVE THEORY OF ADMISSION

A number of out-of-court statements will be admissible without regard to the coconspirator hearsay rule.   For example, the defendant's own statements are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule. *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). The coconspirator statement rule is also not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a). This rule defines "statement" as "a person's assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g.*, *Tuchow*, 768 F.2d at 868

---

[7] As indicated above, the government is not detailing each and every proposed coconspirator statement of each witness or document but rather is giving a representative sample of the statements from each witness and/or document.

n.18.   The coconspirator statement rule also does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).   Many of the conversations between the employees and customers will be offered to establish the existence of a scheme to operate the defendant's businesses in a fraudulent manner. Far from offering the statements for their truth, the statements will be shown to be false through independent evidence. *See Feldman*, 825 F.2d at 127; *United States v. Gibson*, 690 F.2d 697, 700 (9th Cir.1982) ("The investors' testimony was offered to prove the existence of a scheme; the statements were not offered for their truthfulness.")

5.   **CONCLUSION**

In summary, as is evident from their description and as noted above, all the above statements made by coconspirators were made in furtherance of the conspiracy. Under the case law summarized above, all of these statements are properly admissible as coconspirator statements under Fed.R.Evid. 801(d)(2)(E). The United States respectfully requests that this Court find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.

17

Respectfully submitted,

CLIFFORD D. JOHNSON
ACTING UNITED STATES ATTORNEY


By: /s/ Gary T. Bell
Gary T. Bell
Assistant U.S. Attorney
U.S. Attorney's Office
5400 Federal Plaza, Ste. 1500
Hammond, IN 46320

/s/Luke Reilander
Luke Reilander
Assistant U.S. Attorney
M01 Robert A. Grant Federal Bldg.
204 S. Main Street
South Bend, IN 46601

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

By: _/ S / Lorene B. Nelson_
Lorene B. Nelson
Legal Assistant