UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:14-CR-055 JD |
| | ) | |
| JAMES LEDONNE | ) | |

## OPINION AND ORDER

Defendant James LeDonne has been found guilty on his plea of guilty to two counts of fraud. The parties objected to a number of the Presentence Report's conclusions as to Mr. LeDonne's offense level and criminal history score, so the Court held an evidentiary hearing and accepted supplemental submissions from the parties. The Court now sets forth its findings as to the appropriate calculation of the advisory guideline sentencing range.

## I. FACTUAL BACKGROUND

The Court's factual findings are set forth below as to each of the objections, but the Court offers a brief factual background to put those findings in context. James LeDonne controlled a series of businesses that produced vehicles or components used for splicing fiber optic cables. The businesses included Level 4 Technologies LLC; L6 Engineering Systems LLC; L&H Engineering & Design LLC; and LG Engineering & Design Inc. Though the business practices of the companies varied somewhat, each business would accept orders for splicing trucks or other units in return for large down payments, typically around fifty percent. The criminal conduct in this case occurred when Mr. LeDonne would accept those orders and down payments without the capacity or intent to fulfill them, and would also lie to the customers by falsely claiming that the products were being manufactured, offering false reasons for the delays, and giving false promises of refunds. Finally, the businesses would declare bankruptcy, after which Mr. LeDonne would start the next one and repeat the pattern.

Mr. LeDonne was indicted on May 14, 2014 on 17 counts. Counts 1 through 11 charged Mr. LeDonne with wire fraud based on the scheme just described. They alleged that the scheme ran from "2008 through 2014" and involved each of the businesses noted above. The wire transfers and communications underlying each of the 11 counts occurred from August 2011 through September 2013, apparently in relation to transactions by L&H Engineering and LG Engineering. Counts 12 through 14 charged Mr. LeDonne with mail fraud based on the same scheme, and the counts were based on checks that were mailed in December 2012 and May 2013. Counts 15, 16, and 17 charged Mr. LeDonne with conspiracy to commit fraud, interstate transportation of stolen goods, and bankruptcy fraud, respectively, all involving conduct relating to the scheme to defraud.

Mr. LeDonne was arrested on May 19, 2014, and has been continuously detained since then. The ensuing proceedings have been unusually prolonged, due in large part to multiple withdrawals of defense counsel caused by irretrievable breakdowns in communications with Mr. LeDonne. Each time new counsel was appointed, trial had to be continued to allow new counsel adequate time to prepare. Trial was also postponed when the Court ordered a competency evaluation on defense counsel's motion.

Shortly after the Court found Mr. LeDonne to be competent and set a new trial date, Mr. LeDonne filed a notice of intent to plead guilty to two counts: Count 8, a wire fraud charge based on an email sent in March 2013; and Count 14, a mail fraud charge based on a check mailed in May 2013. At the change of plea hearing on April 19, 2017, Mr. LeDonne admitted to a subset of the scheme to defraud charged in the indictment. He admitted that the two transactions by LG Engineering underlying those counts were fraudulent, in that he accepted down payments for orders he knew he could not fulfill, made false statements about the status of the orders and his

ability to fulfill them, and never provided the products or refunds on those orders. He did not further admit that the scheme began in 2008 or that it encompassed other companies such as Level 4 or L6 Systems, as charged in the indictment, though those facts were not necessary to make an adequate factual basis for Mr. LeDonne's guilt as to the two counts.

The Court accepted Mr. LeDonne's guilty pleas and adjudged him guilty of Counts 8 and 14. At the government's request, the Court vacated trial and held the remaining counts in abeyance until sentencing. The Probation Office then prepared a Presentence Report, to which both parties objected. Accordingly, the Court held an evidentiary hearing at which both parties presented witnesses and exhibits, and the parties have since filed supplemental memoranda, so the objections are ripe for ruling.

## II.  DISCUSSION

The Presentence Report concluded that Mr. LeDonne has a base offense level of 7, plus the following enhancements: 16 levels for a loss amount of more than $1.5 million; 2 levels for 10 or more victims; 2 levels for a misrepresentation during the course of a bankruptcy proceeding; and 4 levels for being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. The Presentence Report did not include any reduction for acceptance of responsibility. As to the criminal history score, the Presentence Report gave Mr. LeDonne 3 criminal history points for each of three separate cases in which he was convicted in 1993, for a criminal history score of 9.

The government offered a limited objection, arguing only that Mr. LeDonne should also receive a 2-level enhancement for obstruction of justice. Mr. LeDonne offered a number of objections, arguing that he should only receive 14 levels for the loss amount; that he should not receive an enhancement for misrepresentations in a bankruptcy proceeding; that he should only receive 2 levels for being an organizer or leader; that he should receive a 3-level reduction for

acceptance of responsibility; and that he should only have 3 criminal history points in total. In making those objections, Mr. LeDonne contends that he does not object to the factual content of the Presentence Report, but is arguing the legal consequences of those facts. [DE 338 p. 17; 354 p. 38]. Accordingly, the Court adopts the factual content of paragraphs 1–171 of the Presentence Report. To the extent Mr. LeDonne or the government have objected to the legal conclusions and guideline calculations contained in those paragraphs, the Court addresses them below.

A.    **Loss Amount**

The first point in dispute is the loss amount calculation. Under § 2B1.1(b)(1), an offense level is increased by 16 levels if the loss exceeded $1.5 million, or by 14 levels if the loss exceeded $550,000. The Presentence Report applied a 16-level enhancement for a loss amount of over $1.5 million. It concluded that Mr. LeDonne's relevant conduct began in April 2008, with transactions by Level 4, and that the relevant conduct continued over the years with transactions by L6 Systems, L&H Engineering, and LG Engineering. It thus concluded that the loss amount included 64 transactions entered by those companies during that time, amounting to $1,550,680.31. It also concluded that Mr. LeDonne's relevant conduct included defrauding Roger Roy, an investor in LG Engineering, out of $120,900. Therefore, the Presentence Report applied a 16-level enhancement for a loss amount of $1,671,580.31.

In response, Mr. LeDonne argues that only a 14-level enhancement should apply. He first argues that the transactions by Level 4 in 2008, and by L6 Systems in 2009 and 2010, should not be considered relevant conduct. He also argues that the loss amounts should be reduced by the value of products that he did deliver in some instances. Finally, he argues that Mr. Roy's investment is not relevant conduct and should not be included in the loss amount. The Court addresses each issue in turn.

1. **Level 4 and L6 Systems**

Mr. LeDonne first objects to including any transactions by Level 4 and L6 Systems as part of his relevant conduct. Those transactions took place in 2008 through 2010, and amounted to $691,612. Mr. LeDonne argues that those transactions were distinct from the fraudulent transactions by L&H Engineering and LG Engineering in 2011 through 2013, and that they should not be included in his relevant conduct.

Under the Guidelines, a defendant is accountable for all acts "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," in addition to all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." § 1B1.3(a)(1), (a)(2). Acts are part of the "same course of conduct" if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." § 1B1.3 n. 5(B)(ii). For acts to constitute part of a "common scheme or plan," "they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.* n.5(B)(i).

Here, the Court finds that Mr. LeDonne's relevant conduct includes the transactions by Level 4 and L6 Systems. To begin with, the indictment explicitly charges that the scheme to defraud included those companies and occurred during that time frame. It alleges that "LeDonne utilized the following companies to execute a scheme to defraud victim purchasers of these mobile fiber optic splicing and testing units: Level 4 Technologies LLC; L6 Engineering Systems LLC; L&H Engineering & Design LLC . . . ; and LG Engineering & Design Inc." [DE 1 p. 1]. And though the wires and mailings underlying each of the individual counts took place in 2011 through 2013, the indictment charged that the schemes ran from "2008 through 2014" and

from "2009 through 2013." *Id.* at 3, 5. Thus, the transactions by Level 4 and L6 Systems are within the offense conduct charged in the indictment.

In addition, the transactions by those companies are part of a common scheme or plan as the later transactions, as they share a common class of victims, some common accomplices, a common purpose, and a similar *modus operandi*. The scheme involving LG Engineering (to which Mr. LeDonne has admitted) aimed to defraud purchasers of fiber optic units out of their payments by offering to sell units that it could not provide, making false promises to customers about the status of the orders and the delivery dates or making false promises of refunds, and failing to produce the products or refunds, before finally declaring bankruptcy to avoid collection efforts. The transactions at issue involving Level 4 and L6 Systems were essentially the same: the companies accepted orders and down payments for units they could not produce, offered the customers a variety of lies about delivery dates and refunds, failed to actually deliver the products or provide refunds, and eventually declared bankruptcy.

Mr. LeDonne argues that those companies were not part of the scheme to defraud because, unlike LG Engineering, they were each able to provide products to at least some customers. He argues that the "criminal activity in this case commenced when decisions were made to accept orders even though the company did not have the capacity to produce the unit." [DE 338 p. 8]. However, the evidence shows that that happened at both Level 4 and L6 Systems too. Christine Banke, who worked for several of Mr. LeDonne's companies, testified that Level 4 was satisfying some orders at the beginning. [DE 347 p. 52–53]. By 2008, though, it could no longer pay its vendors and thus could not obtain materials and could not produce products. *Id.* at 52–55; *see also id.* at 211–12 (similar testimony by Ann Kaser, another employee). Nevertheless, Mr. LeDonne continued approving sales knowing that he could not provide the products to the

customers, and Level 4 sold trucks that it did not own. *Id.* at 52–56 ("Q. In 2008, was Mr. LeDonne approving sales knowing that he couldn't manufacture product or provide product to customers? A. Yes."). Ms. Banke also testified that in the last six months of Level 4's existence, she and other employees lied to customers at Mr. LeDonne's direction on a daily basis, misrepresenting the status of the orders and making false excuses for their failure to produce either the products or refunds. *Id.* at 56–58. Ms. Banke further testified that a similar pattern occurred with L6 Systems, which fulfilled some orders but increasingly suffered similar problems and offered similar lies to its customers. *Id.* at 61. Moreover, the Presentence Report's descriptions of each of the transactions by Level 4 and L6 Systems largely mirror each of the transactions by L&H Engineering and LG Engineering. Each time, the companies extracted large down payments, falsely told the customers the units would be delivered by certain dates, but never provided the units or provided a refund.

Those commonalities suffice to show that the transactions at issue, which came during the latter portions of Level 4 and L6 Systems' respective existences, were fraudulent and were part of the same scheme to defraud as the offenses of conviction. Accordingly, the Court overrules Mr. LeDonne's objections in this respect.

### 2. Reductions for Products Supplied

Mr. LeDonne next argues that the loss amount should be reduced in certain instances by the value of products that his companies did provide to some customers. In each instance, however, Mr. LeDonne's companies never lawfully conveyed the products in question, as they did not actually own them. For example, El Oso bought a truck from L6 Systems, but Mr. LeDonne sold the truck knowing that it actually belonged to the bankruptcy estate of a previous company. Mr. LeDonne later retrieved the truck from El Oso and El Oso never received a replacement or a refund. Pine Tree also purchased a truck from L6 Systems, but L6 Systems did

not provide a certificate of origin, as the truck likewise belonged to the other company's bankruptcy estate, and the truck Pine Tree received was not what it had ordered. Vorcom received one of the two vans it bought from L&H Engineering, but it did not receive the title, as L&H Engineering did not actually hold the title to the van.[1] Lightride eventually received a used loaner trailer from L&H Engineering, but that trailer had actually been stolen under the guise of a recall from Accelerated Networks, another customer.

Mr. LeDonne notes that some of these customers eventually obtained ownership of the vehicles, so he argues that their actual losses were mitigated. Even so, these transactions would still count at least as intended loss, as Mr. LeDonne's companies conveyed units that they did not actually own and that could have been (and in some cases were, DE 335 ¶¶ 19, 31) taken back from those customers. Under § 2B1.1, the loss amount is the greater of the actual loss—"the reasonably foreseeably pecuniary harm that resulted from the offense"—or the intended loss— "the pecuniary harm that the defendant purposely sought to inflict." § 2B1.1 n. 3(A); *see United States v. Higgins*, 270 F.3d 1070, 1075 (7th Cir. 2001) (noting that intended loss "turns upon how much loss the defendant actually intended to impose," regardless of whether the loss materialized or was even possible).[2] Here, Mr. LeDonne gave some customers possession of units, but he did not and could not lawfully transfer the rights of ownership of those units. El Oso and Pine Tree's units belonged to the bankruptcy estate of a different company; Vorcom's unit belonged to a financing company; and Lightride's unit was stolen from another customer.

---

[1] Vorcom eventually obtained a title after spending $50,000 in legal fees, and the government argues in its post-hearing brief that Vorcom's loss amount should be increased by amount. Because that amount would not affect the proper offense level, the Court need not consider that argument. In addition, that argument seems to count both the actual and intended loss for the same transaction.

[2] When there are multiple victims, the loss amount can include the actual loss for some and the intended loss for others. *United States v. Lauer*, 148 F.3d 766, 767 (7th Cir. 1998).

That Mr. LeDonne provided those customers with possession of units to placate them and delay their collection efforts does not change that he intended to defraud them out of their payments. Nor does it make a difference that some of the customers were eventually able to obtain ownership of the units through their own means.[3] Again, those self-help measures do not change the fact that Mr. LeDonne intended to defraud those companies out of their payments by promising them units he could not lawfully convey, which makes this intended loss. *United States v. Dunham*, 766 F.3d 672, 687 (7th Cir. 2014) ("[T]he amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property." (quoting *Lauer*, 148 F.3d at 768)). In fact, Mr. LeDonne's filings never acknowledge intended loss or argue why these transactions do not fit that criteria. Accordingly, the loss amount will not be reduced based on the units provided to these companies.

Mr. LeDonne further argues that the losses by El Oso and Accelerated Networks, each of which initially received a unit that Mr. LeDonne then took back, should not be included as relevant conduct because they were not part of the same scheme. The Court disagrees. El Oso is part of the same scheme because L6 Systems sold a truck it did not actually own, defrauding the customer out of the purchase price and making a number of false statements about providing a replacement unit or a refund, similar to the rest of the transactions. The unit that Mr. LeDonne stole from Accelerated Networks is also included in the loss because it is actual loss that Mr. LeDonne inflicted in order to provide a unit to lull another victim of the scheme to defraud. Accordingly, the Court finds that the full amounts of the customers' payments are properly included in the loss amount.

---

[3] That could, however, affect the restitution amount, which remains to be determined.

### 3. Roger Roy

Last, Mr. LeDonne argues that the investments by Roger Roy should not be included in the loss amount, as they are not relevant conduct. On that issue, the Court agrees. Mr. Roy was an acquaintance of Mr. LeDonne, and Mr. LeDonne approached him with an opportunity to invest in LG Engineering in April 2013. Mr. LeDonne represented that LG Engineering had a large number of backorders pending but that it needed funding to produce the units. He asked to borrow $20,000 from Mr. Roy, and said he would pay Mr. Roy $30,000 the following month. Mr. Roy agreed. He gave Mr. LeDonne a check for $20,000, and Mr. LeDonne gave him a check for $30,000 to cash the following month. When the following month came around, however, Mr. LeDonne made excuses for why that check could not be cashed, and he sought additional amounts from Mr. Roy. Over the following year, Mr. Roy invested about $100,000 more into LG Engineering and Mr. LeDonne's other companies, but did not receive a return.

The Court cannot find that this conduct constitutes relevant conduct to Mr. LeDonne's offense of conviction. The government argues that Mr. Roy's investment should be included in the loss amount "because, simply put, Mr. LeDonne defrauded Mr. Roy." [DE 355 p. 16]. However, that is not enough to show that this conduct is part of a common scheme or plan or the same course of conduct as Mr. LeDonne's offenses of conviction. Granted, there is some factual overlap between the two schemes, as some of the backorders included in a spreadsheet that Mr. LeDonne used to induce Mr. Roy's investment were the fraudulent transactions underlying his offenses of conviction. Still, these were fundamentally different schemes. The scheme underlying Mr. LeDonne's convictions involved defrauding customers out of their down payments, whereas the scheme involving Mr. Roy involved defrauding an investor out of an investment. The two schemes did not share common purposes, victims, accomplices (Mr. LeDonne appears to have acted alone relative to Mr. Roy), or *modus operandi*. The government

10

also suggests that Mr. LeDonne engaged in this conduct in order to avoid detection for the fraud scheme, but it has not actually demonstrated such a connection.

Accordingly, the Court sustains Mr. LeDonne's objection to including Mr. Roy's investments as part of the loss amount. Therefore, the Court subtracts the $120,900 loss amount attributable to Mr. Roy, producing a total loss amount of $1,550,680.31. Because that amount exceeds $1.5 million, Mr. LeDonne receives a 16-level increase under § 2B1.1(b)(1)(I).

**B.    Misrepresentation in a Bankruptcy Proceeding**

Next, Mr. LeDonne objects to a 2-level enhancement under § 2B1.1(b)(9)(B), which applies when an offense involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." The government contends that this enhancement is justified based on misrepresentations made in three separate bankruptcy proceedings: the 2013 petition by LG Engineering, the 2010 petition by L6 Systems, and the 2008 petition by Techline (another similar company Mr. LeDonne controlled). The Court need only address the first, as it plainly justifies the enhancement.

In LG Engineering's bankruptcy filing, it claimed to have $558,229 in accounts receivable, and it included a list of customers that allegedly owed it money for certain products that had been delivered. During the section 341 creditors meeting, the trustee questioned Mr. LeDonne about those accounts receivable:

> Trustee:         All right. On the schedules that were filed with the Court, you show accounts receivable for the company with a face value of $558,000, but you indicate they're uncollectible. Why do you feel these are uncollectible?
>
> Mr. LeDonne:  The product that was delivered was not complete.
>
> Trustee:         All right.
>
> Mr. LeDonne:  The orders were not complete.

| | |
|---|---|
| Trustee: | What needed to be done to complete them? |
| Mr. LeDonne: | Various components and accessories. |
| Trustee: | Were the products delivered – |
| Mr. LeDonne: | Yes. |
| Trustee: | So the customer could complete it for a price? |
| Mr. LeDonne: | That's correct. |

[PSR ¶ 85]. It is undisputed, however, that the products in question had never been delivered, so this testimony was false. The misrepresentation was also made during the course of a bankruptcy proceeding and was part of the offense. The bankruptcy proceedings were a component of the scheme, and the misrepresentation helped conceal the nature and extent of the underlying fraud. As Mr. LeDonne admits, the fraud occurred when he had neither the ability nor intent to fulfill the orders, and stating that his company had in fact delivered products to each of its customers concealed that incriminating information; truthfully responding to the trustee's questions would have meant admitting to facts that could help reveal or prove his fraudulent conduct. Thus, each of the elements for this enhancement are present.

In arguing to the contrary, Mr. LeDonne suggests that the trustee was only concerned with *whether* the accounts were collectible, and that he truthfully testified that they were not. That is not accurate; the trustee specifically inquired into *why* the accounts were not collectible, and Mr. LeDonne lied in response to direct questions on that topic. Accordingly, these misrepresentations during LG Engineering's bankruptcy proceeding justify the 2-level enhancement, and Mr. LeDonne's objection is overruled.

### C. Organizer–Leader

Mr. LeDonne next objects to a 4-level enhancement for being an organizer or leader. Section 3B1.1 provides for various enhancements based on the defendant's role in the offense. If

the defendant was an organizer or leader in the criminal activity, then the offense level is increased by 2 levels. § 3B1.1(c). However, if the defendant was an organizer or leader "of a criminal activity that involved five or more participants or was otherwise extensive," the offense level is increased by 4 levels. § 3B1.1(a). To qualify for this enhancement, the defendant must have had a supervisory role over at least one other "participant." § 3B1.1 n. 2; *United States v. Cooper*, 767 F.3d 721, 733 (7th Cir. 2014). A "participant" is a person "who is criminally responsible for the commission of the offense, but need not have been convicted" or charged. § 3B1.1 n.1; *United States v. Haywood*, 777 F.3d 430, 433 (7th Cir. 2015); *United States v. Blaylock*, 413 F.3d 616, 618 (7th Cir. 2005). For the 4-level enhancement to apply, the criminal activity must involve five or more participants—meaning the defendant and four others—or be otherwise extensive. § 3B1.1(a); *Haywood*, 777 F.3d at 433. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." § 3B1.1 n.3.

Here, there is no dispute that Mr. LeDonne exercised a sufficient degree of control over the enterprises to qualify as an organizer or leader. [*E.g.*, DE 347 p. 50–53 ("[H]e was the owner and he was involved with everything, every department, every transaction, from manufacturing to sales to the office to everything.")]. Thus, the questions are whether Mr. LeDonne supervised at least one other participant (as would justify at least a 2-level enhancement), and if so, whether the criminal activity involved at least five participants or was otherwise extensive (as would justify a 4-level enhancement). Mr. LeDonne did not initially dispute the first question, as he argued in favor of only a 2-level enhancement. In his post-hearing memorandum, however, he

argues that he should not receive any leadership enhancement at all because no other individuals were criminally responsible for the conduct, so there were no other participants.

That argument is insubstantial. For one, Ann Kaser worked for Mr. LeDonne from 2005 to 2007, and then again from 2010 to 2012, during which time she worked for L&H Engineering and LG Engineering (which Mr. LeDonne concedes were part of the scheme to defraud). Ms. Kaser testified that she knowingly told lies to customers at Mr. LeDonne's direction. [DE 347 p. 215–17, 226]. For example, she knew that Mr. LeDonne had delivered to one of his customers a vehicle to which he did not hold the title, as noted above. When that customer asked about the status of the title so it could begin using the vehicle, she said at Mr. LeDonne's direction that "all of the paperwork was sent to corporate," which would be sending the title, even though there was no "corporate" and the title was not going to be sent. *Id.* at 215–17. Christine Banke also worked for Mr. LeDonne's companies from 2006 to 2010, and she testified to lying to customers on a daily basis at Mr. LeDonne's direction. *Id.* at 55–62. Those lies to customers were part of an effort to forestall action by the customers and mask the fraudulent nature of the scheme. Because those individuals knowingly aided Mr. LeDonne's activity by telling lies to keep the customers at bay, they qualify as participants, *Blaylock*, 413 F.3d at 618 ("What matters is that [the participant] knowingly aided some part of the criminal enterprise."), so Mr. LeDonne qualifies for at least a 2-level enhancement.

The remaining question is whether the activity involved five or more participants or was otherwise extensive. Mr. LeDonne was one participant, and Ms. Kaser and Ms. Banke were two more. There is also ample evidence that many other employees told lies at Mr. LeDonne's direction and were used to advance his scheme. Though there is some question as to whether those individuals qualify as participants, as some of them denied that they knew about the

14

fraudulent nature of the conduct at the time of their involvement, their involvement would at the very least make the scheme otherwise extensive. *United States v. Fluker*, 698 F.3d 988, 1002 (7th Cir. 2012) ("[A] scheme is otherwise extensive if the number of participants plus outsiders who unwittingly advance a conspiracy is greater than five."). Christena Kandzierski testified to multiple occasions on which, at Mr. LeDonne's direction, she provided information to customers that she later learned was false. [DE 346 p. 232–35]. Duane Curlee testified to creating fake fliers and soliciting orders for trucks that Mr. LeDonne did not own and could not provide. *Id.* at 118–22. Eric Nelson likewise knowingly provided false information to customers. *Id.* at 136–42. Ms. Banke testified that other employees lied on Mr. LeDonne's behalf too. *Id.* at 58. On top of that, the length of time that the scheme ran, the amount of money it fraudulently obtained, and the geographic scope it reached all further show that the scheme was extensive. *See Fluker*, 698 F.3d at 1002; *United States v. Hussein*, 664 F.3d 155, 162 (7th Cir. 2011). The scheme ran for multiple years, collected payments exceeding $1.5 million, and dealt with customers in dozens of different states across the country.

For those reasons, the Court finds that Mr. LeDonne was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. The Presentence Report thus properly included a 4-level enhancement under § 3B1.1(a), and Mr. LeDonne's objection is overruled.

## D.      Obstruction

Next, the government argues that Mr. LeDonne should receive a 2-level enhancement for obstruction of justice. Under § 3C1.1, a defendant receives a 2-level enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction . . . ." § 3C1.1. The application notes provide some examples to clarify the scope of

this provision. For example, the enhancement applies if the defendant "provid[es] materially false information to a probation officer in respect to a presentence or other investigation for the court." § 3C1.1 n.4(H). However, the enhancement does not apply if the defendant merely "provid[es] incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation." *Id.* n.5(C).

In seeking this enhancement, the government relies on statements Mr. LeDonne made to the probation officer who was preparing the Pretrial Services Report in advance of his initial appearance. The probation officer asked Mr. LeDonne a number of questions about his background in order to prepare the report and make a recommendation to the magistrate judge as to whether Mr. LeDonne should be released on bond. Among other topics, she inquired into Mr. LeDonne's criminal history. She began by asking if he had any criminal history. Mr. LeDonne said "no," denying any criminal history. [Government ex. 23 p. 2–3, 12]. However, the probation officer had already run a criminal history report and knew that Mr. LeDonne had multiple previous felony convictions in Indiana and in federal court. The probation officer confronted him with those convictions, and when asked about the state convictions, Mr. LeDonne replied that they were all "tied into the federal case," which the probation officer interpreted as attempting to minimize his history. *Id.* Mr. LeDonne also had a misdemeanor conviction for disorderly conduct in 1989 in Arizona, which the probation officer was not aware of at the time. Mr. LeDonne never mentioned that conviction, and it did not appear in the Pretrial Services Report.

The government argues based on those facts that the obstruction enhancement is warranted because Mr. LeDonne first denied any criminal history, then minimized his Indiana convictions, and omitted his Arizona conviction. In response, Mr. LeDonne primarily focuses on the latter issues. He argues that his statements about his Indiana convictions were fair

characterizations, if perhaps imprecise, as his sentences in those cases were supposed to run concurrent to his federal sentence, and one of his state convictions was vacated. He also suggests that his Arizona conviction from about 25 years earlier may have just slipped his mind.

The critical fact to this enhancement, though, is that Mr. LeDonne initially denied having any criminal history whatsoever. [Government ex. 23 p. 2–3, 12]. That statement was false, as Mr. LeDonne has multiple previous convictions, and was also material, as a defendant's criminal history is relevant to deciding whether he should be released on bail. *United States v. Owolabi*, 69 F.3d 156, 163 (7th Cir. 1995) ("[T]he defendant's failure to give a truthful and accurate account of his prior criminal record was clearly material, because it was relevant to the magistrate's determination concerning whether or not he should be released on bail, and if so, the amount of the bond necessary to ensure his appearance."). The misrepresentation was clearly intentional as well. Mr. LeDonne is a convicted felon and spent years in a federal prison; there is no chance that he simply forgot he had a criminal history. *See United States v. Rogers*, 45 F.3d 1141, 1144 (7th Cir. 1995) ("[I]t is quite implausible that [the defendant] forgot his arson conviction and one motor vehicle theft; he was incarcerated for both offenses."). Thus, that initial statement meets the requirements of the application note for conduct constituting obstruction. *See United States v. Ojo*, 916 F.2d 388, 393 (7th Cir. 1990) ("[The defendant's] action in providing false information to the pretrial services officer, who was conducting a bail investigation for the court, falls squarely within the application note.").

Mr. LeDonne also argues that his statements did not impede the investigation, as the probation officer was already aware of his criminal history. In support, he cites *United States v. Yell*, 18 F.3d 581, 583 (8th Cir. 1994), in which the Eighth Circuit held that an obstruction enhancement was unwarranted where the defendant initially minimized his conduct but later

admitted it fully. However, the Seventh Circuit has held that recanting misrepresentations does not prevent an obstruction enhancement. *United States v. Thomas*, 11 F.3d 1392, 1401 (7th Cir. 1993) ("Nor can [the defendant] escape the obstruction enhancement by showing that he later recanted his false statement."); *United States v. Gaddy*, 909 F.2d 196, 199 (7th Cir. 1990). It does not matter that the probation officer already knew much of Mr. LeDonne's criminal history, either, as the guideline covers both actual obstruction and attempts to obstruct justice. § 3C1.1; *Owolabi*, 69 F.3d at 163–64.[4] That Mr. LeDonne's attempt to conceal his criminal history was short-sighted does not make it less of an attempt. He first denied any criminal history at all, then acknowledged (but minimized) only those convictions the probation officer already knew about, and failed to mention another conviction. That sequence leaves little doubt that Mr. LeDonne was attempting to conceal his criminal history.

Accordingly, the 2-level enhancement for obstruction of justice is warranted, so the Court sustains the government's objection.[5] Having resolved the objection on that basis, the Court need not reach the government's alternative arguments in favor of the enhancement.

## E.    Acceptance of Responsibility

Mr. LeDonne next objects that the Presentence Report did not include a 3-level reduction for acceptance of responsibility. Under § 3E1.1, a defendant receives a 2-level reduction "[i]f the

---

[4] While providing false information to a law enforcement officer warrants an obstruction enhancement only when it "significantly obstructed or impeded the official investigation or prosecution," no such effect is required when a defendant provides false information to a probation officer. § 3C1.1 n.4(G), (H); *Owolabi*, 69 F.3d at 163–64.

[5] That said, the Court acknowledges that this conduct is relatively minor on the spectrum of conduct that qualifies for this enhancement, as it occurred at the very outset of the case, was short-lived, and had little if any effect. As with some of the other guideline rulings, this finding rests on the application of technical guideline definitions that may or may not accurately reflect the seriousness of the underlying conduct. At the § 3553(a) stage, the Court can look past the fine distinctions and arbitrary cutoffs in the guidelines and consider the underlying conduct itself to arrive at a reasonable sentence. *See United States v. Snyder*, 865 F.3d 490, 500 (7th Cir. 2017). The parties may address those issues at the sentencing hearing.

defendant clearly demonstrates acceptance of responsibility for his offense." § 3E1.1(a). A defendant can receive a further reduction of 1 level upon a motion by the government if "the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty . . . ." § 3E1.1(b). Unlike the enhancements discussed above, a defendant bears the burden on this issue, and must "'clearly demonstrate' acceptance of responsibility by a preponderance of the evidence" in order to receive these reductions. *United States v. Cunningham*, 103 F.3d 596, 598 (7th Cir. 1996).

The Guidelines note that pleading guilty prior to trial and truthfully admitting the offense conduct, plus truthfully admitting or not falsely denying relevant conduct, "will constitute significant evidence of acceptance of responsibility." § 3E1.1 n.3. Doing so, however, does not entitle a defendant to a reduction as a matter of right: "Evidence pointing toward acceptance of responsibility may be outweighed by other incompatible acts or statements." *United States v. Sellers*, 595 F.3d 791, 793 (7th Cir. 2010); § 3E1.1 n.3 (noting that a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility"). "The sentencing judge is required to look beyond formalistic expressions of culpability and to determine whether the defendant has manifested an acceptance of personal responsibility for his offenses in a moral sense." *United States v. DeLeon*, 603 F.3d 397, 408 (7th Cir. 2010); *see United States v. Gilbertson*, 435 F.3d 790, 799 (7th Cir. 2006) (noting that courts "assess whether a particular defendant is motivated by genuine acceptance of responsibility or by a self-serving desire to minimize his own punishment").

Here, Mr. LeDonne pled guilty to two counts of the indictment, and admitted to sufficient facts to establish a factual basis for those offenses. That factor thus weighs in his favor. A number of factors, however, point in the opposite direction. To begin with, the Guidelines direct

courts to consider "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." § 3E1.1 n. 1(H). Mr. LeDonne was indicted and arrested in May 2014, yet he did not enter a guilty plea until almost three years later, in April 2017. That factor thus weighs heavily against Mr. LeDonne.[6] *United States v. Boyle*, 484 F.3d 943, 945 (7th Cir. 2007) ("[P]leading guilty eventually, rather than immediately, is specifically listed in the Guidelines as a strike against acceptance points . . . .").

Moreover, throughout that time span, Mr. LeDonne vociferously protested that this prosecution was malicious and baseless, and he repeatedly directed tremendously inappropriate comments towards the prosecutor and investigating agents:

- Mr. Schmid, After being tortured for the last 375 days, I wonder when you pull in your drive-way of your Granger home and family, if the thoughts of how you punished my family and myself come to mind. . . . You personally decided (not a grand jury) but you personally distorted, exaggerated and vindictively scripted thru 2 uninformed ISP agents Stuckey and White; civil issues that you described as criminal. . . . My efforts to bring you, Stuckey and White to further litigation and to the attention of the AG's office will continue until I die. What you did to my kids cannot be forgiven. But I don't want you to forget either, so before you go home to your family think about the pain you brought to me and my family over civil matters. (Business) . . . Schmid you have been mis-informed, misguided and your misconduct and obsession was fatal to me and my family. May God save you. [DE 169-1].

- Mr. Schmid, You have successfully destroyed me and my family. You have falsely charged me. You have publicly humiliated me and my family. You have distorted facts and lied to my Judge. . . . You have no empathy, moral or civil compassion for children and the sanctity of a marriage and family. You falsely accused me and you do not care who you hurt in the process. . . . You have committed crimes against humanity and citizens of this country. . . . I do not ever want to see you or place eyes on you again. You disgust me. Your presence makes me vomit. As does Stuckey and White. You truely [*sic*] are <u>EVIL</u>! [DE 157].

- What Schmid has done to me and my family is the true crime, and before I die I will prove to this Court, this Government and this Country how evil Schmid

---

[6] This factor alone would justify the government in withholding the third-level reduction under § 3E1.1(b): "In general, the conduct qualifying for a decrease in offense level under subsection (b) will occur particularly early in the case." § 3E1.1 n.6.

truely [*sic*] is. . . . Schmid, is truely [*sic*] deceitful with the Court, with Probation and everyone in this case. Schmid is narcistic [*sic*], psychotic, self-serving, pathological son of a bitch. Or as my Jewish friends would say a true scum bag. First I am not guilty and I will proove [*sic*] the Schmids of the world are the true criminals. [DE 153].

- I have every intention of re-building in Granger and the St. Joe Cty Community after this nightmare is over. Schmid's machination is no more than illusion and bad faith. May God save him, but he appears to be an atheist. [DE 128].

- I respectfully thank Your Honor for taking the time and not being influenced by Schmid's peanut gallery so his name can appear in the media and his kids at St. Joe High School and his neighbors can give him a pat on the back. [DE 42].

- The Court need <u>not</u> review its prior detention orders because all the facts and testimony were part of a chimera, and artifices created by a mentally disturbed former AUSA who's trickery was accepted by this Court for decades . . . . [DE 274-1 p. 33].[7]

Mr. LeDonne also sent emails to the victims in this case, asserting that the case is "a mockery of justice," and attempting to lay the blame on other individuals. [DE 289-2]. Even after his guilty plea, Mr. LeDonne has continued leveling accusations against the former prosecutor. [DE 357 p. 3, 6, 20]. These accusations and ad hominem attacks are fundamentally inconsistent with someone who recognizes and takes responsibility for his own wrongdoing.

Mr. LeDonne's attorney argues in his favor that he has not objected to the factual content of the Presentence Report, only to the legal conclusions drawn from those facts, so he has not falsely denied relevant conduct. Mr. LeDonne himself, however, has not had the same discipline. Rather, in various letters written to the probation officer following his guilty plea, Mr. LeDonne asserted that the case is "a mockery of justice in every respect," and he falsely denied aspects of

---

[7] The prolific letters through which Mr. LeDonne made most of these statements also violated the Court's repeated admonishments that Mr. LeDonne was only permitted to communicate with the Court through his attorney. Even after the Court barred the filing of any letters by Mr. LeDonne, he continued sending letters, which each time were returned to him with a copy of the order restricting his filings. The docket reflects that Mr. LeDonne violated that filing restriction on 19 occasions, 5 of which occurred after his guilty plea.

his conduct. [DE 357 p. 4]. Among other things, he asserted that the "alleged victims . . . are disgruntled unsecured creditors from closed bankruptcies," *id.* p. 8, that he "did not control" any of the businesses in question, *id.* at 13, and that he never told his employees to lie, *id.* at 17. He also asserted that the "actual loss is below $550,000," *id.* at 33, even though his attorney concedes that the actual losses from the transactions Mr. LeDonne admits were fraudulent exceed $850,000. [DE 354 p. 32]. Again, these statements are inconsistent with a genuine acceptance of responsibility.

Thus, while the Court acknowledges that Mr. LeDonne's guilty plea saved the government the burden of proceeding to trial, which may be a mitigating factor, the Court cannot find that Mr. LeDonne has clearly demonstrated acceptance of responsibility for his offenses so as to qualify for a reduction for acceptance of responsibility. Accordingly, the Court overrules this objection.

## F.    Criminal History Score

Finally, Mr. LeDonne objects to the calculation of his criminal history score. Mr. LeDonne received three criminal history points for his previous federal conviction, as well as three points each for his state convictions for theft and forgery, for a total of nine points in criminal history category IV. Mr. LeDonne objects only to the state convictions. He argues that they are too old be counted, and that even if they are within the applicable time period, they should be counted together instead of separately. At the hearing, the parties agreed that the forgery conviction had been vacated on collateral review. That conviction is thus not pointable, which moots the latter argument. As to the relevant time period for the theft conviction, the Court found above that Mr. LeDonne's relevant conduct began in 2008, with a number of transactions by Level 4. Mr. LeDonne was released from imprisonment on his theft conviction on July 20, 1995, less than 15 years before his relevant conduct began, so this conviction is

within the applicable 15-year time period. § 4A1.2(e)(1). Accordingly, the PSR properly assesses three criminal history points for the theft conviction in paragraph 118. Combined with the three points for Mr. LeDonne's previous federal conviction for fraud, that amounts to a total criminal history score of six, in criminal history category III.

## III.  CONCLUSION

To summarize the above findings: Mr. LeDonne has a base offense level of 7. The offense level is then increased by 16 levels for a loss amount of more than $1,500,000, § 2B1.1(b)(1)(I); 2 levels for more than 10 victims, § 2B1.1(b)(2)(A)(i); 2 levels for making misrepresentations during the course of a bankruptcy proceeding, § 2B1.1(b)(9)(B); 4 levels for being an organizer or leader of criminal activity, § 3B1.1(a); and 2 levels for obstruction of justice, § 3C1.1. The offense level is not reduced for acceptance of responsibility, § 3E1.1. Thus, Mr. LeDonne's total offense level is 33. Mr. LeDonne receives 3 criminal history points for his 1993 state theft conviction and 3 criminal history points for his 1993 federal fraud convictions, for a criminal history score of 6, placing him in criminal history category III. Thus, the applicable advisory guideline range is 168 to 210 months of imprisonment in Zone D of the sentencing table.

SO ORDERED.

ENTERED:  January 4, 2018

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court